MARY AGNES LYNN, RESPONDENT, v. BUSINESS MEN'S ASSURANCE CO. OF AMERICA, APPELLANT.—111 S. W. (2d) 231.

Kansas City Court of Appeals. March 18, 1938.

*Earl J. Boughan* and *Dwight Roberts* for respondent.

*Harzfeld, Beach, Steeper & Gordon* for appellant.

CAMPBELL, C.—The defendant on October 16, 1934, issued to George Lynn, hereinafter called the insured, a contract of insurance in which it was provided that if the insured's death were caused by bodily injuries effected directly and independently of all other causes, through accidental means, it would pay to plaintiff, wife of the insured, the sum of $5000. The insured died on March 4, 1935, from the effects of a gunshot wound inflicted by James Gonce. The defendant when informed by plaintiff of the death of insured denied liability on the ground that death was not due to accident.

On April 11, 1935, the plaintiff accepted the sum of $2700, paid to her by the defendant, and executed a release in which it was stated that the sum so received was in full settlement of her claim under the policy. Thereafter, she brought this suit to recover the balance alleged to be due under the terms of the insurance contract, obtained

a verdict and judgment in the sum of $2681.80, of which $138 was interest and $243.80 was damages. The defendant has appealed.

The answer was a general denial followed by allegations to the effect that the insured made misrepresentations in his application for the policy concerning his occupation, in this, that insured represented that he was the "traveling representative, Ford Motor Company" and that his duties were "calling on dealers, sales promotion;" that after the issuance of the policy insured changed his occupation from that of representative of the Ford Motor Company to the occupation of gambling and operating gambling devices and games in Jackson County, Missouri, and that no notice of such change of occupation was given to the defendant; that on April 11, 1935, it fully settled plaintiff's claim, received a release from plaintiff, and that insured at the time of his death was engaged in gambling with other men, and that his death "grew out of and arose" from gambling operations.

The evidence on behalf of the plaintiff shows that the insured was an employee of the Ford Motor Company in Jackson County, Missouri for some fourteen years prior to his death; that he never drank except an "occasional beer," did not gamble professionally or carry firearms and that his reputation was good; that in the early part of 1935 he became the Ford Motor Company's dealer at Salina, Kansas, moved from his home in Independence, Missouri to Salina and was not in Jackson County, Missouri from that time until March 2, 1935, at which time plaintiff and the insured went from Salina to the home of plaintiff's parents near Independence, where insured stayed until the morning of the next day. When insured moved to Salina, he rented a dwelling house to James Gonce. During the daytime of March 3, insured searched for Gonce for the purpose of collecting rent which the latter had neglected to pay. Failing to find Gonce during the day, the search was resumed in the evening. Plaintiff, upon being advised to do so, went to a sanitarium about 1:30 o'clock A. M. March 4, where she found the insured suffering from a gunshot wound. The wound caused the death of insured some six hours later. The bullet which took the life of the insured struck the left side of his chest and ranged downward.

The evidence for the plaintiff further shows that about 9:30 o'clock on the morning of April 11, 1935, the defendant's adjuster, Weaverling, and Ross Richards, adjuster for the American Central Life Insurance Company, which had issued a life policy to the insured in the amount of $5000, went to the home of plaintiff for the purpose of adjusting plaintiff's claim on both policies. According to the plaintiff, Richards on this occasion said to her that he did not owe her anything except $125 or $130, return of premium, and Weaverling said to her that his company did not owe her a cent because their investigation disclosed that the death of insured was not due

to accident; that the adjusters stayed at her home until about 11:30 o'clock in the forenoon, urged her to settle and each explained that they didn't owe her anything; that because of the statements and conduct of the adjusters she was grief stricken and left the room; that at that time a neighbor, Mrs. Gold, was present and suggested to the adjusters that they should pay the mortgage on plaintiff's home; that one of the adjusters offered to ascertain the amount of the mortgage; that during all this time the adjusters kept urging her to settle and that she refused to do so; that when the adjusters were leaving her home, Richards told her not to consult a lawyer and Weaverling said, "That's right, Mrs. Lynn, don't consult with any lawyer or we will have you arrested" for making "false claim;" that the adjusters returned to her home about one o'clock, again urged her to settle and made her an offer in a lump sum of $2000 in payment of the claims on both of the policies; that the next offer was $4000, the next $4750, the next $5750 and the next $6750, which last offer she accepted; that until she accepted that offer nothing had been said concerning the amount either company would pay. When plaintiff accepted the amount stated, Weaverling issued a check to her in the sum of $2750 and she executed a release in which it was recited that the payment of that amount was in full settlement of her claim against the defendant, and at the same time Richards paid to plaintiff the sum of $4050 in settlement of the claim on the life policy; that when the adjusters made the offer of $6750, they "had on their coats and hats and they were going, and that was the last offer they were going to make, I could take it or leave it, and they were walking out and that is when they told me I could hire lawyers and 'what the lawyers didn't get the courts would get;' " that during the negotiations Weaverling said something about the insured being a gambler, had misrepresented his occupation when he applied for the insurance and for that reason the policy was not in force; and that she believed the adjusters would carry out their threats, believed their representations and was induced thereby to make the settlement.

The defendant's witness, Brady, who was present at the time of the settlement, testified that he advised plaintiff not to accept the settlement, and that the adjusters did not threaten plaintiff. Weaverling was the defendant's witness. He testified that prior to April 11 he investigated the cause of the death of the insured, talked with prosecuting attorneys at Independence and with the attorneys for Gonce; that he submitted the facts which he found to the general counsel of the company and was told that the defendant could not recognize liability under the policy; that he and Richards went to plaintiff's home on the morning of April 11, and Richards told plaintiff "that their position was that a refund of premium was all that that company owed Mrs. Lynn because of the fact that the policy had been secured by misrepresentation;" that he said to

plaintiff that the defendant had refused "to pay the claim on the ground that their policy was an accident policy, and Mr. Lynn's death was not due to accidental means;" that he pointed out that their investigation indicated that Mr. Lynn was a rather heavy drinker, a gambler, and had operated gambling concessions in some of the clubs in and around Independence; that he and Richards agreed on a lump sum offer of $4000 to dispose of both claims and that he submitted the offer to plaintiff; that in response to the offer plaintiff offered to settle the claims for $7500; that after further discussion, plaintiff said she would accept $5750, and that he and Richards agreed to pay that amount; that thereupon he prepared a release which was signed by plaintiff, and gave her check for $2700 and that Richards gave plaintiff check for $4050. The witness further testified that "a gambler or a man engaged in gambling" is uninsurable and would not be accepted by his company; that the policy contained a provision as follows:

"This policy includes the indorsements and attached papers, if any, and contains the entire contract for insurance except as it may be modified by the Company's classification of risks and premium rates in the event that the insured is injured after having changed his occupation to one classified by the Company as more hazardous than that stated in the policy, or while he is doing any act or thing pertaining to any occupation so classified, except ordinary duties about his residence or while engaged in recreation, in which event the Company will pay only such portion of the indemnities provided in the policy as the premium paid would have purchased at the rate, but within the limits so fixed by the Company for such more hazardous occupation."

That under that provision, if the insured's death were caused by accident, the amount payable was $100; denied making any threats; denied that he said, "what the lawyers didn't get the courts would get;" stated that he said to plaintiff "this was a very questionable claim, and if she ever got to a lawyer, he probably would take it on a contingent basis and even though she won her suit she would not be as well off as a good settlement;" that after the settlements were made he told plaintiff if she were asked what kind of settlement was made, to say that it was a "satisfactory settlement" and not to state the amount received by her; that he secured and read written statements evidently taken by the sheriff soon after the shooting; that he read the original statement of J. W. Fleener and communicated the facts stated therein to the defendant. The statement of Fleener which was introduced in evidence was as follows:

"My name is Jay W. Fleener. I live at Blue Springs, Missouri. I operate a filling station at a tourist camp on 40 Highway, a mile and one-half east of Blue Springs. I have had this place for the

past three years. I have known George Lynn about two years and he has been in my place many times but not in the past three weeks.

"I know a man named Peaches Perry, his first name I believe is Rowe, for about a year. About three months ago Peaches came out to my place with a man whom he introduced to me by some name, I don't remember, however, I later learned that his name is Gonce. Gonce and I shot some craps but I grabbed the dice and told him that I wouldn't shoot any more. I knew then that this Gonce had come out to my place to take me but he didn't get away with it. I have not seen Gonce from that day until last night, March 3rd, 1935, about midnight at the Van Horn Inn.

"About 7:00 o'clock last night, March 3rd, George Lynn, Art Elsie and George's brother Walter, whom they call Fats, came out to my place and we had a few beers and talked for probably a half hour because I had not seen George for some time, then George and Art left in their car but Walter stayed at my place. After they had left Walter told me that he had no money and that some one would have to take him home. After some conversation I started to take him home. It was about 11:00 o'clock when we left my place, when we got to Independence, Walter said he wanted to go to some place west of town about a mile, on Spring Branch Road. We stopped out there for about twenty minutes and then we came back to town as I was in a hurry to get back to my place. Then he asked me to take him to Van Horn Inn, which I did. When we arrived there we found George Lynn, Gonce and Art Elsie, sitting at a table right close to the bar. I jokingly asked Gonce if he remembered who I was, and he said, 'Yes, sure I know you.' I don't believe that I sat down at the table but I had some drinks. After I had been there twenty-five or thirty minutes I received a phone call from my wife asking me if it would be all right to close up my place and bring some people that were there to the Van Horn Inn. I said, 'Yes.' While we were sitting there drinking and before I got the telephone call I heard George Lynn and Gonce arguing about some money. I didn't pay much attention to it at the time and don't know just what the argument was about. In a short time George Lynn, Art Elsie, Jim Gonce and myself went into the back room at this place and sat at a table and ate some hamburger sandwiches and drank some beer. While we were eating there was not much arguing, however, one or two things were said back and forth by Lynn and Gonce and in a few minutes Elsie got up and went to the bar. After he left the argument got hotter, it seemed to me that Lynn wanted to borrow some more money from Gonce, but Gonce wouldn't let him have it. I believe that Gonce had already let him have $22.50. Lynn cursed Gonce and called him names deriding him and at one time when Gonce reached for his hip pocket Lynn said, 'Damn you, Gonce, you better have the difference because you will need it.' I then got up and went to the bar where

Elsie was and told him that I thought the boys were getting into a pretty hot argument and that he had better go back and straighten them out. Art stood there just a minute when we heard a shot in the back room. Art then went to the back room and took George Lynn out the back door.

"Just after the shot was fired I saw deputy sheriff Jno. Hiffner and Rush go into the back room. A few minutes after Elsie had left with George and the sheriffs had gone into the back room I went back. Neither George Lynn or Gonce were drunk in my opinion, although they had been drinking a little beer."

The defendant offered in evidence a photostatic copy of the written statement of Gonce. In ruling plaintiff's objection to the introduction of the copy the court said: "It will be admitted for the benefit of the court and not read to the jury." The effect of this ruling was to exclude the copy from the evidence in this case. The defendant does not complain of the ruling, nor call attention in its brief to the contents of the copy. We will therefore rule the case as though the copy had not been offered in evidence.

There was no evidence showing the contents of any of the statements referred to by Weaverling, except the statement of Fleener, nor did Weaverling at any time state the facts which his investigation disclosed save to state in general terms his deductions concerning the investigation. The evidence of Richards, defendant's witness, was in effect the same as the testimony of Weaverling except he testified that "we asked Mrs Lynn what the amount of the mortgage was, telling her that that had a great deal to do with our being able to go any further on the discussion." The defendant's witness, Kelly, deputy sheriff, testified that he "raided a place in Sugar Creek one time" where there was a dice table and some card tables, and that the insured was "banking the game. He wasn't conducting the game. He had the money;" that the profits of the game came to insured, and that the insured had the reputation of being a professional gambler. The witness did not say when the raid was made, and there is nothing in his evidence showing whether the raid was made before or after the time when insured applied for the policy. John Lattimer, for the defendant, testified that he had seen the insured gambling in Sugar Creek a few times, and "one time" he saw insured "banking the game." There is nothing in his evidence indicating the time when he saw the insured gambling, or "banking the game."

The defendant assigns error to the action of the court in refusing its request for directed verdict.

When the insured died, the defendant owed the plaintiff $5000 or it owed her nothing. The payment of $2700 did not discharge the obligation imposed by the terms of the policy unless there was "an honest difference between the parties, a dispute in good faith."

[Sappington v. Central Mutual Insurance Company, 77 S. W. (2d) 140, 144.]

The death of insured was caused by violence. There was nothing in the evidence introduced by plaintiff tending, even remotely, to show that death was not through accidental means. The main question is whether or not the evidence shows that the defendant *at the time of settlement* had information which caused it to believe there was no liability. Weaverling testified that he examined the written statements of some twelve persons. The written statement of Fleener, above quoted, was the only statement which was introduced in evidence. Though Weaverling said the defendant had information indicating that insured was a rather heavy drinker, a gambler and the operator of gambling concessions, he stated *no fact* showing that either he or the defendant had such information. Neither at the time of settlement nor in the trial did Weaverling state any fact showing that he was justified in making the charge. There was nothing in the statement of Fleener (and that is the only statement brought to us) warranting the denial of liability on the ground of misrepresentations in obtaining the policy or justifying the assertion that insured was a heavy drinker, a gambler or the operator of gambling games. There was no evidence to the effect that insured was a heavy drinker *at any time* nor was there any evidence showing that insured gambled at any time subsequent to the issuance of the policy save on the night he lost his life, nor was there evidence showing that insured's *occupation* was that of a gambler or the operator of gambling devises. The word "occupation" means "that which occupies time and attention, a calling, or a trade." [46 C. J., 895.] The fact, if it were a fact, that insured "banked" one or two gambling games at a time not disclosed, and that he gambled a few times was not sufficient to show that his occupation was that of a gambler or the operator of gambling devices, nor was it sufficient to show that he changed his occupation from that of agent and representative of the Ford Motor Company to that of a gambler.

There was a material variance between the written statement of Fleener and his evidence in the trial. The substance of the statement was that insured and Gonce were drinking beer in the Van Horn Inn, were arguing about money; that a little later Fleener, Gonce and the insured went into a back room where they sat at a table, had some sandwiches and beer; that insured sought to borrow money from Gonce, cursed Gonce, called him names, and that when Gonce "reached for his hip pocket" insured said, "damn you Gonce, you had better have the difference because you will need it;" that he, Fleener, then went to the bar, told the keeper that he thought "the boys were getting into a pretty hot argument and he had better go back and straighten them out." It will be noted there is nothing in the statement indicating that the insured left his chair or that he

advanced toward Gonce. His statement concerning the "difference" was made when Gonce "reached for his hip pocket." Nor does the statement say the insured was gambling. Though the evidence of Fleener at the trial cannot be considered in determining the question as to whether or not the defendant at the time of settlement believed death was not through accidental means, it is not amiss to state the difference between the contents of the statement and the evidence of the witness. In his evidence Fleener said that the insured "jumped up" from the table, said to Gonce, "if he had a gun, he had better reach for it;" that thereupon he started from the room and that the insured at that time was approaching Gonce, "shaking his fist at him or something."

The defendant makes much of the term "difference." It will be noted that the statement of Fleener says that that term was used in reply to the act of Gonce in "reaching for his hip pocket." It is plain the written statement of Fleener is not consistent with his evidence in the trial.

The defendant argues that "there was an honest difference of opinion in good faith as to whether the defendant under the facts was liable under its accident policy." The question as to whether or not there was a *bona fide* controversy concerning liability must be determined from the information in the possession of defendant at the time of settlement, not from facts developed in the trial. In determining whether or not there was a *bona fide* controversy, all of the facts and circumstances in evidence, including the statements of Weaverling made on the day of settlement, must be considered.

It is undisputed that insured for several years immediately preceding his death was the representative and agent of the Ford Motor Company. The duties of his position were, of course, burdensome. Weaverling knew that fact or he made no real investigation. When Weaverling met the plaintiff on April 11 he denied liability, made the unfounded charge concerning the habits of the insured, a charge which even the defendant does not, in its brief, attempt to justify. When the charge, a grave one, was made, according to Weaverling, "Mrs. Lynn was naturally very much distressed and she left the room. . . ." Denial of liability was followed by an offer of $2,000 in settlement of both policies. The day wore on and the offer was increased several times. The last offer, $6750, was accepted. The denial of liability followed a few hours later by the offer of such a substantial amount suggests the question, why did the adjusters make that offer if they in good faith believed there was no liability?

In this connection it must be remembered that Weaverling testified the defendant's general counsel said that liability could not be recognized under the policy.

The argument of Weaverling to the effect that plaintiff should settle for the reason that if she brought a suit and won it the amount

of attorneys' fees would be taken from the proceeds of the suit and she would in consequence receive less than she would receive in a settlement, was an unfair argument. Such arguments are made by debtors who do not dispute the amount of the debt. It will not be claimed, however, that such a debtor could make such an argument in good faith.

The adjusters acted in concert, each aided the other, asserted the policies were obtained through misrepresentation. The claim was not only groundless but it ignored the fact that in so far as misrepresentations were concerned, section 5782, Revised Statutes of Missouri, 1929, was applicable to both policies. [Williams v. Mutual Life of Illinois, 283 S. W. 64.] And while we cannot in this case determine the liability or nonliability of the American Central Life Insurance Company, it is proper to say that neither on the day of settlement nor in the trial was any fact disclosed which warranted Richards in denying liability on the life policy. It must be remembered that the only offers of settlement were offers to settle both policies. Hence the defendant had the benefit of the denial of liability made by Richards—a benefit to which it was not entitled.

The threat made by the adjusters to cause plaintiff to be arrested was first made on the forenoon of April 11. That threat was repeated several times during the afternoon of that day, a fact developed in the cross examination of the plaintiff.

The threats, the statement concerning court and lawyers and many other statements made by Weaverling are not consistent with the present claim that there was a dispute in good faith concerning liability. On the contrary, the evidence was sufficient to allow the jury to find that the denial of liability was a pretense, a plan adopted for the purpose of inducing plaintiff to accept a sum less than the amount to which she was entitled.

Considering all the facts and circumstances in evidence, we hold the case was one for the jury.

The defendant complains of the action of the court in permitting plaintiff to introduce evidence tending to show fraud and duress, for the reason that the amount received in settlement had not been offered to the defendant, and for the further reason that under the pleadings duress was not an issue. Plaintiff in direct examination, in answer to a question in which she was asked to state the conversation with the adjusters, said that Richards advised her not to consult a lawyer and Weaverling said: "That's right, Mrs. Lynn, don't consult with any lawyer or we will have you arrested." Following this answer the plaintiff, without objection, was asked and answered seven questions covering more than one page of the record before the objection to evidence showing fraud or duress was made. The objection was too late.

Plaintiff did not offer to return the amount she received in the settlement and she could not, under the facts of this case, recover on the ground of fraud and duress. This for. the reason she knew the contents of the release, knew the release provided that she was accepting $2700 in full settlement and payment of her claim. She did not affix her signature to the release because she believed the terms and provisions thereof were different from what they actually were. In other words, she was not tricked into affixing her signature to an instrument, believing it to be another and different instrument. In such circumstances she, in the absence of an offer to return the amount received, could not maintain the action upon the ground of fraud and duress. [State ex rel. v. Shain et al., 98 S. W. (2d) 597.]

But the statements of Weaverling and the statements of Richards, which were adopted by the former, were admissible because they tended to show that the refusal to pay the claim was vexatious, the absence of a *bona fide* controversy, the lack of a dispute in good faith and want of consideration. [Sheppard v. Travelers Protective Ass'n of America, 104 S. W. (2d) 784, 787.]

The defendant criticizes plaintiff's instruction No. 1 for the reason that it submitted the question of fraud and duress. The instruction submitted the question of fraud, duress, the absence of a *bona fide* controversy, and want of consideration in the conjunctive. The fact that the instruction placed a heavier burden on the plaintiff than she was required to carry, did not hurt the defendant.

Complaint is made of the refusal of defendant's instructions G and H. Instruction G would have told the jury that the issue of fraud was withdrawn from its consideration. Instruction H said that the question of duress was withdrawn from the consideration of the jury. Had those instructions been given, a part of the burden imposed upon plaintiff by her instruction No. 1 would have been removed. The refusal of the instructions was not reversible error.

The plaintiff at the close of the evidence was permitted to amend her reply. The first reply was a general denial. The amended reply denied the new matter alleged in the answer and stated facts sufficient to show that the settlement was without consideration, was procured through fraud, duress, and bad faith on the part of the defendant. The defendant objected to the filing of the amended reply. When the reply was tendered, the court said that it would permit the reply to be filed and that defendant was entitled to a continuance. On the morning of the next day the defendant, though still objecting to the filing of the amended reply, elected to proceed with the trial. It was within the sound discretion of the court to allow the amendment. [Sec. 819, R. S. 1929; Reed v. Koch, 282 S. W. 515; Peterson v. Metropolitan Street Railway Company, 111 S. W. 37; National Life and Accident Insurance Company v. Lay et al., 39 S. W. (2d) 1070.]

The defendant, having declined the continuance, has no just grounds to complain of the filing of the amended reply.

Error is assigned to the giving of plaintiff's instruction No. 4 which submitted the question of penalty and attorney's fees. In support of the assignment the defendant argues that there was no evidence showing that the refusal to pay was vexatious. We have stated the facts and shall not restate them. It suffices to say that there was ample evidence warranting the giving of the instruction.

The defendant argues that its demurrer to the petition should have been sustained. At the time the demurrer was presented, the petition pleaded the same grounds in avoidance of the settlement which were later stated in the amended reply, the allegations of which we have hereinbefore stated. The allegations of the petition concerning matters in avoidance of the release were no part of plaintiff's cause of action and should not have been inserted in her petition. However, when the demurrer was overruled, defendant answered over thus waiving the demurrer. Thereafter, the amended reply was filed. In these circumstances the ruling on the demurrer will not work reversal.

In its brief the defendant says that there was no evidence of fraud and duress practiced upon the plaintiff. The facts which we have stated show both fraud and duress.

Plaintiff, prior to the commencement of the trial, filed motion for judgment on the pleadings. The motion was overruled. Thereafter the amended reply was filed. When the amended reply was filed the question of the validity of the settlement was an issue in the case. Thereafter, defendant chose to proceed with the trial. Thus, the question as to whether or not the motion for judgment on the pleadings, based as it was on the insufficiency of the first reply, should or should not have been sustained, is of no moment.

The foregoing disposes of all of the questions presented on this appeal. The judgment is affirmed. *Sperry, C.,* concurs.

PER CURIAM:—The foregoing opinion of CAMPBELL, C., is adopted as the opinion of the court. The judgment is affirmed. All concur.

### ON MOTION FOR REHEARING.

On motion for rehearing the defendant says "the statement of Gonce was introduced in evidence for the benefit of the court: The court was the only one to properly pass upon what the statement contained and whether or not it constituted sufficient grounds to create a *bona fide* controversy." This contention is made for the first time in the motion for rehearing. Neither in assignments of error, points and authorities, nor in argument does the defendant make the present claim concerning the statement of Gonce.

Moreover, the claim that the statement of Gonce was for the court, not for the jury, is not consistent with the defendant's conduct at the trial. It not only offered the Gonce statement in evidence, but when the statement was excluded, saved an exception to the ruling, and it introduced and read the statement of Fleener to the jury.

The main opinion ruled the case on its own facts and to that ruling we adhere. The motion for rehearing is overruled. *Sperry, C.,* concurs.

PER CURIAM:—The foregoing opinion of CAMPBELL, C., is adopted as the opinion of the court. The motion for rehearing is overruled. All concur.