# MARCH, 1939.

CORA B. BRIZENDINE, RESPONDENT, v. CENTRAL LIFE INSURANCE COMPANY, APPELLANT.—131 S. W. (2d) 906.

Kansas City Court of Appeals. July 31, 1939.

*McAllister, Humphrey, Pew & Broaddus* and *C. F. Douglass* for appellant.

*Harvey Roney* and *Carl Borello* for respondent.

KEMP, J.—This is an action upon a policy of life insurance bearing date of April 6, 1936, issued by defendant Central Life Insurance Company of Illinois, upon the life of Fred W. Brizendine, who was then, and at the time of his death, a resident of Independence Missouri.

Upon trial of the case the jury returned a verdict in favor of plaintiff in the amount of $2612.50, upon which judgment was duly rendered in like sum, from which judgment defendant has prosecuted this appeal.

Cora B. Brizendine, plaintiff herein, was the wife of the assured and was named as beneficiary in said policy. The face amount of said policy was $2500. Attached to said policy and forming a part thereof was what is known as a "double indemnity" agreement, which provided that the company would pay $5000 in lieu of the face amount of said policy in the event of accidental death as the term is therein defined.

The record discloses two applications for this insurance, dated, respectively, March 22 and March 26, 1936. In each of said applications the following questions and answers appear, to-wit:

"Q. Are you a total abstainer? A. Yes.

"Q. If not, to what extent do you use alcoholic beverages? A. None.

"Q. Have you been intoxicated within the last five years? A. No."

Between 2:00 and 2:30 in the morning of March 26, 1937, the assured was injured critically as a result of an automobile which he was driving colliding with the structural portion of an underpass. He was moved to the Independence Sanitarium, where he died at about noon of the same day, without having regained consciousness.

On April 22, 1937, Hugh Markey, defendant's agent at Independence, and Ralph M. Waterbury of Chicago, who was director of agencies for defendant company, went to plaintiff's home with a view to making a settlement with plaintiff. As a result of the discussion which there ensued, plaintiff executed a "Receipt and Release," which recited that plaintiff "for and in consideration of the sum of Two Thousand Five Hundred ($2500) Dollars, to me cash in hand paid by the Central Life Insurance Company of Illinois, the receipt of which is hereby acknowledged, do hereby . . . release and forever discharge said Central Life Insurance Company of Illinois . . . from any and all claims, demands and causes of

action at law or in equity, due to, or in any manner arising out of Policy No. 121708, issued by the said Central Life Insurance Company of Illinois, upon the life of Fred W. Brizendine, deceased.''

The release was dated April 22, 1937, and was duly acknowledged before a Notary on the same day. Defendant, in accordance with the terms of said release, paid plaintiff the sum of $2500, by its check dated April 23, 1937.

This suit is for $2500, being the balance alleged by plaintiff to be due from defendant under the terms of said ''double indemnity'' contract of insurance.

Defendant, in its answer, admits the death of assured through accident, but alleges that there was a *bona fide* controversy between plaintiff and defendant as to whether or not there was any liability under said policy, and that defendant paid plaintiff $2500 in full settlement of said disputed claim and that plaintiff executed her ''Receipt and Release'' based upon said consideration and is bound thereby.

The answer alleged the further defense that ''insured's death resulted from the commission of a felony.'' There was, however, no evidence offered in support of this charge, and no point touching said charge is made in this appeal.

Plaintiff filed reply which put in issue these allegations.

Appellant's assignments of error are as follows:

''I. The court erred in failing to give defendant's instruction in the nature of a demurrer offered at the close of all the evidence in the case.

''II. The court erred in giving Instruction I.''

The contention made by appellant in support of each of these assignments is that there was no evidence from which a jury could find ''that there was no *bona fide* dispute concerning appellant's liability under the terms of the policy''. This is, therefore, the sole point involved in this appeal. Its determination requires a consideration of all the evidence pertinent thereto.

Within a week following the death of the assured, the plaintiff furnished to defendant duly executed proofs of the death of the assured. Among these were sworn statements by the two physicians, Dr. Zeller and Dr. Nickson, who attended assured following his fatal injuries. These identical forms filled out by these two physicians contained the following questions:

''Did deceased use alcoholic or narcotics?

''If so, did they contribute to the fatal illness?''

To the first of these questions, Dr. Zeller, who had treated assured for influenza in 1935, answered, ''Not to my knowledge,'' and to the second question, ''No.'' Dr. Nickson, in answer to the first question, said ''Yes—alcoholic beverages,'' and to the second question, ''Yes, alcoholism.''

At the trial Dr. Nickson testified that he was called to the Independence Sanitarium to attend assured whom he had not previously known; that from the time he first saw the assured until his death a few hours later, the assured did not regain consciousness. At the time he saw him there was just a faint odor of alcohol on assured's breath; it was mixed with the odor of blood, which has a peculiar odor itself after certain length of time; that it would be impossible to say to what extent he was under the influence of alcohol.''

''Q. Or whether or not he was under the influence of alcohol at all? A. Yes. All I could tell he had a faint odor of alcohol on his breath.''

Questioned about the answers he made in the proof of death, Dr. Nickson said they were ''based solely upon the faint odor of alcohol on his breath.'' From his observation of the assured, he stated that he could not tell whether he had been intoxicated or not, or to what degree, if any, he had been under the influence of alcohol.

Wallace Jones, a witness produced by defendant, testified that he saw the assured at the County Home, where both were employed, at a little past midnight of the day assured was injured. As far as he could see, the assured was all right and did not appear to have been drinking. He testified that the assured hadn't been drinking for two or three years, but that prior to that time he had seen him with ''a little too much.'' *When* he saw assured with ''a little too much'' does not appear. When asked if he had seen assured in this condition within the past six years, the witness replied: ''I wouldn't say how long it had been since I seen him take a drink.''

Defendant called William Junkins, who was likewise employed at the Jackson County Home. He testified that he saw the assured shortly after midnight; that the assured was to take Junkins' place at 11:00 o'clock, but did not do so. He testified that the assured seemed all right and that he saw no indication that he had been drinking.

Mrs. Mike Casey, testifying on behalf of defendant, stated that assured came to her home at about 2:00 o'clock in the morning and wanted to deliver to her some seed oats which he stated he had in the car. She told him to take them around to the granary, but he stated he didn't know where it was. He did not deliver the oats. In answer to further questioning, the witness testified: ''I don't know how drunk he was, he didn't stagger and he talked mannerly to me. I couldn't say how much he had been drinking.''

R. L. Duncan, called by defendant, testified that he lived at Independence, operated a restaurant where he sold beer by the drink, and that he had known Fred Brizendine for fifteen or sixteen years prior to his death; that he had never seen him ''take a drink, only beer,'' and that this was some three or four years ago; that he had seen him drinking pretty heavily about three years ago; that he

had seen him intoxicated possibly four or five times. At no place in his testimony, however, did he say that he had seen the assured take a drink subsequent to "about three years ago." He further testified that the first time he ever discussed this matter with defendant, or any of its representatives, was within two weeks prior to the trial (which was begun on January 24, 1938).

Riley Lattimer, called by defendant, testified that he attended bar at the Eagle Lodge in Independence; that he was acquainted with Brizendine in his lifetime; that Brizendine came to the Eagle Lodge about 10:00 o'clock in the morning prior to his injury, and that he saw him about the club off and on during the day, and that he left the club between 11:00 and 12:00 o'clock that night; and that he served him one bottle of beer during the day, and that was the only drink he had, so far as he knew.

Defendant also called Harold Kjar, who testified that he was a police officer and had known Brizendine for about eight years; that he went to the scene of the accident wherein Brizendine was fatally injured; that he found the automobile headed in a northerly direction on a north-south street, and that it had struck the southwest abutment of the underpass at an angle to the west. He further testified that he assisted in taking Brizendine out of the car, and that in helping him out he was in close proximity to the assured but that he was not able to smell any odor of intoxicating liquor on Brizendine's breath.

Joseph Copeland, James Lattimer and Robert Woodsmall each testified that he had seen and talked with the assured within the matter of approximately two hours prior to the time of the accident, and each testified that he had not noticed any smell of alcohol on the breath of assured, and that he appeared perfectly normal at the time each had respectively seen or talked to him.

Four witnesses called by the plaintiff each testified to seeing assured at the scene of the accident and to being in close proximity to assured's face, and each testified that he did not notice any smell of alcoholic beverages on assured's breath.

Charles Vieth testified he had known the assured for twenty-five years and accompanied Mrs. Brizendine to the hospital to see him; that he was right next to the bed where assured was lying and that he noticed no smell of alcoholic beverages on his breath; that although he had seen the assured several times a week during the past six or seven years, he had not seen him drinking within that period.

This represents the substance of all the testimony both with respect to plaintiff's use of alcohol and with respect to the question of whether or not he was under the influence of liquor at the time of the fatal accident.

We now pass to a consideration of the respective versions of plaintiff, Mr. Markey, defendant's local agent, and Mr. Waterbury, de-

fendant's director of agencies, as to the conversation that was had in plaintiff's home leading up to her execution of the "Receipt and Release."

Plaintiff testified that shortly after her husband's death, Mr. Markey, the local agent of the company, brought her forms of proof of death to be executed; that after the execution of same she heard nothing more from the company about the claim until on or about April 23, when Mr. Waterbury, accompanied by Mr. Markey, came to her home to discuss this claim; that Mr. Waterbury told her that they were authorized to pay her for the straight life claim on her husband's policy, but that the company had evidence that her husband had been drinking at the time of the accident and "for that reason they denied any liability on the accident policy;" that the company had proof of this and "for that reason they would not pay the accident policy."

Plaintiff also testified that in this conversation there was "no dispute on the straight life policy". She stated that when she received the check she did not read it over, but stated, "I know they told me they were paying me the full amount of straight life policy, but they weren't paying me anything on the accident policy because they didn't owe me anything." In answer to a further question, plaintiff testified, "Well, they told me that they didn't owe me anything on the accident policy and I couldn't have signed a release on that. They denied liability and said that there was no—that they didn't owe me anything."

Plaintiff further testified that after signing the release she did not consult with any of her friends until some time after she had cashed the check, and until she was paid on an accident policy issued by the Federal Life Insurance Company, at which time the representative of this company asked her about this claim.

Hugh Markey testified that he and Mr. Waterbury talked to plaintiff on April 22, 1937 at her home, and that Waterbury stated to plaintiff he did not consider there was any liability at all under the contract; that he made various proposals of settlement, mentioning $1000, $1500, and finally stating that he would recommend the payment of $2500. This is contradicted in effect by Mr. Waterbury, who testified that the release with the $2500 amount inserted, was prepared in Chicago before he started on this trip. When asked what reason Waterbury gave for saying that the company did not consider that there was any liability under the contract, Mr. Markey said:

"Well, in the first place, he (Waterbury) said there was fraud in the procurement, was the way I understood it, one of the objections to it. Another objection was that he had some papers there, signed by some doctor, regarding the claim. For that reason he said there was no liability on the company at all.

"Q. All right. Then what was said by Mr. Waterbury and Mrs. Brizendine in your presence? A. Well, of course, Mrs. Brizendine said she didn't know hardly what to do about the whole matter. She said that there had been a lot of talk and a lot of things going on and she didn't know hardly how to make her decision, and it was talked over pro and con, and finally Mr. Waterbury offered to put through a settlement of $2500 provided it was agreeable with the home office, and she signed the release, gave him the policy, and we went back up to Independence. Mr. Waterbury went down to the Western Union office and sent a wire to the home office."

On cross-examination, these further questions and answers appear:

"Q. He (Waterbury) said, 'I have evidence that Fred had been drinking', is that right? A. Well, in the death report, or proof of death submitted, he had a copy of Dr. Nickson's report at that time.

"Q. And that report in the proof of death was what he was relying on at that time as to whether or not Fred had been drinking?' A. Well, I couldn't say as to that because I know they made their own personal investigation afterward, I didn't see that but he told me that they had.

"Q. *I am speaking now of the time Mr. Waterbury and you went out to see her and this controversy that existed, so far as you know they had no evidence nor discussed any evidence about this case, except to say that they had some evidence that Fred had been drinking, is that right?* A. *That is right.*" (Italics ours.)

Mr. Waterbury's version of what occurred at this conference with plaintiff appears from the following excerpt from his deposition:

"Q. What was the purpose of your visit to the home of Mrs. Brizendine? A. To tell her that the company would not pay the full amount of the policy on account of information that we had.

"Q. Relative to what? A. The information that we had relative to his, Mr. Brizendine's drinking.

"Q. Now, Mr. Waterbury, will you relate in your own way as near as you can what your conversation was with Mrs. Brizendine on that occasion? A. Mrs. Brizendine contended that her husband had not drank and was not under the influence of liquor at the time of his death.

"Q. And was there any further conversation, and what then, if anything, took place? Tell us in your own way. A. I told Mrs. Brizendine that any settlement that was made must be entirely satisfactory to her—

"Q. Well, did you— A. On account of our agent, Mr. Markey—no, make it this way—must be entirely satisfactory to her, and unless she was so well pleased with the settlement that she would assist Mr. Markey in securing new business, I would not recommend any settlement to the company."

This fairly covers all of Mr. Waterbury's testimony bearing upon the purpose of his visit to plaintiff's home and the conversation there, leading up to the execution of the release.

It is well-settled that where there is a *bona fide* dispute either as to liability or as to amount claimed to be due, the law looks with favor upon avoidance of litigation through compromise and settlement of the dispute. In absence of fraud or duress, the parties to such a settlement agreement will be bound by the terms thereof. [Sheppard v. Travelers Protective Assn. of America, 124 S. W. (2d) 528, l. c. 530.]

In such case, the payment of a part of the disputed indebtedness constitutes a good and sufficient consideration for the release of the balance. But where the amount of the indebtedness is undisputed and the debt is unquestionably due, the payment of a part thereof is no consideration for the release of the balance. Nor will a mere pretended dispute—a controversy not raised in good faith—affect the operation of this rule of law. [Vaughn v. Conran (Mo. App.), 4 S. W. (2d) 495, l. c. 496; Harms v. Fidelity & Casualty Co. of New York, 157 S. W. 1046, l. c. 1049; Berry v. Detroit Casualty Co. (Mo. App.), 300 S. W. 1026, l. c. 1028.]

Furthermore, the question of whether or not there was a genuine good faith dispute as to liability must be determined in the light of the information in the possession of the defendant at the time of the settlement. Information discovered subsequent to a settlement certainly could not afford the basis of a controversy existing at the time of the settlement. Hence, facts developed at the trial of a case, unless shown to have been in the possession of the party relying on the release at the time the settlement was consummated, would not support the contention that a *bona fide* dispute existed at the time the settlement was made and the release executed. [Lynn v. Business Men's Assur. Co. of America (Mo. App.), 111 S. W. (2d) 231, l. c. 236.]

Applying these rules of law to the facts in the case at bar, we are convinced that no *bona fide* dispute as to the liability under this policy of insurance existed at the time the settlement was consummated and the release executed.

It is appellant's contention that it had information with reference to assured's use of intoxicants, which information indicated that his statements with reference thereto in his applications for insurance, were false, and that the subject matter of these representations—the use of alcoholic beverages—contributed to cause assured's death.

As heretofore noted, assured in his applications for insurance, dated respectively March 22 and March 26, 1936, stated that he was then a total abstainer and that he had not been intoxicated within the past five years. The proofs of death include a statement of Dr. Nickson which contained the following questions and answers:

"Q. Did deceased use alcohol or narcotics? A. Yes—alcoholic beverages.

"Q. If so, did they contribute to the fatal illness? A. Yes, alcoholism."

Appellant undoubtedly had this information at the time the settlement was made. But admitting the truth of these statements of Dr. Nickson, they could not sustain the charge that the assured, at the time of his applications for insurance, had misrepresented the facts then existing. These statements of Dr. Nickson cannot be said to negative the statement of the assured that in March, 1936, he was a total abstainer, or the statement of assured that he had not been intoxicated within five years preceding March, 1936. These facts recited by Dr. Nickson, assuming them to be true, standing alone, did not constitute any defense to appellant's liability under this policy. If, at the time of the settlement and release, this was all the information appellant had with respect to assured's use of alcoholic beverages, then there was no genuine, *bona fide* dispute as to appellant's liability, and hence no consideration for the release.

The record discloses no evidence to the effect that the appellant, at the time of the settlement with respondent, was informed of any of the facts testified to at the time of the trial with reference to assured's use of alcoholic beverages, other than the information disclosed in Dr. Nickson's statement in the proof of death. There is not a line of testimony to the effect that any representative of the appellant company had talked with, or received any information from, any of the other witnesses who testified at the trial, at or prior to the date of settlement. We have heretofore pointed out that information acquired subsequent to the time of settlement would not afford a basis for the contention that a settlement was made as a result of a *bona fide* dispute between the parties.

It may be urged that the testimony of the witness Duncan to the effect that he had seen assured "drink pretty heavily" three or four years ago, furnishes a basis for the contention that the assured had misrepresented the facts when he stated he had not been intoxicated within the five-year period prior to the date of said applications. *However, the witness Duncan further testified that the first time he had ever discussed this matter with the defendant, or any of its representatives, was within two weeks prior to the trial* (which was begun on January 24, 1938). Here, then, is positive testimony that appellant did not have this information at the time of the settlement.

Nor does the testimony of the witness Wallace Jones support appellant's position. There is nothing in this witness' testimony that conflicts with assured's statement that he was a total abstainer at the time of his applications for insurance. *When* this witness saw him with "a little too much" does not appear. When asked whether he

had seen the assured intoxicated within the past six years, he answered that he was unable to say when he had last seen him take a drink. Nowhere in his testimony does it appear that he had seen the assured intoxicated within five years prior to his applications for insurance. Furthermore, there is no evidence as to when the appellant, or its representatives, had interviewed the witness Jones or as to when it received the information of the facts to which Jones testified. But even if it be assumed that appellant was aware of these facts at the time of the settlement, they do not contradict the representations made by assured. From neither standpoint, therefore, would this testimony sustain the contention that there was a *bona fide* dispute existing at the time of the settlement.

We hold, therefore, that the trial court properly overruled defendant's demurrer to the evidence. In so holding, it follows that there was sufficient evidence from which the jury could find, as it was required to do under respondent's instruction 1, that there was no *bona fide* dispute at the time of settlement.

The judgment is affirmed. *Shain, P. J.*, concurs; *Bland, J.*, not sitting.